UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MICHAEL MILLET                                      CIVIL ACTION

VERSUS                                              NO. 15-452

CAROLYN W. COLVIN, ACTING                           SECTION "H" (2)
COMMISSIONER OF SOCIAL SECURITY

## REPORT AND RECOMMENDATION

Plaintiff, Michael Millet, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying plaintiff's claim for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under Titles II and XVI of the Act. 42 U.S.C. §§ 423, 1382c. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2(B).

I.   PROCEDURAL HISTORY

Millet filed his applications for DIB and SSI on November 16, 2011, alleging disability beginning April 15, 2011, due to vascular autoimmune disease, arthritis, bipolar disorder, and hepatitis A, B and C. (Tr. 197). After his claims were denied at the agency level, he requested a hearing before an Administrative Law Judge (ALJ), which was held on October 11, 2012. (Tr. 54-97). The ALJ issued a decision denying the application on January 7, 2013. (Tr. 38-50). After the Appeals Council denied review

on December 30, 2014, the ALJ's decision became the Commissioner's final decision for purposes of this court's review.  (Tr. 1-7).

Plaintiff filed a timely memorandum in support of his appeal.  Record Doc. No. 11.  Defendant filed a timely reply memorandum.  Record Doc. No. 14.

## II.   STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.   The ALJ failed to apply the proper legal standard when assessing plaintiff's residual functional capacity and the finding is not supported by substantial evidence.

B.   The ALJ erred by relying on a hypothetical question propounded to the vocational expert that is not substantial evidence.

## III.   ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

1.   Plaintiff has not engaged in substantial gainful activity since his alleged onset date of April 15, 2011.  Although he worked after that date trimming trees, his work activity did not rise to the level of substantial gainful activity.  However, his part-time work activity "is supportive of the ability to work and certainly darkens the claimant's credibility."

2.   Millet received unemployment benefits for seven consecutive quarters, until his benefits expired in the fourth quarter of 2011.  By receiving unemployment benefits, he held himself out as ready, willing and able to work, and was required to seek employment actively.  "This draws further upon the claimant's credibility and is also supportive of an ability to work."

3.   He has severe impairments consisting of hepatitis, arthralgias and vascular autoimmune disorder.

4.   Millet has no impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.

2

5. He has the residual functional capacity to perform light work except that he can only occasionally stoop, kneel, crouch, crawl, balance and climb ramps and stairs; cannot climb ladders, ropes or scaffolds; must avoid concentrated exposure to extreme temperatures and environmental irritants; and cannot work at unprotected heights or with dangerous or heavy machinery.

6. Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. However, his statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity.

7. He cannot perform his past relevant work as a deckhand.

8. Considering his age, education, work experience and residual functional capacity, jobs exist in significant numbers in the national economy that plaintiff can perform, including dishwasher; cleaner, housekeeping; and janitor/cleaner.

9. Millet has not been under a disability from April 15, 2011, through the date of the ALJ's decision.

(Tr. 40-50).

IV.   ANALYSIS

A.   Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Richard ex rel. Z.N.F. v. Astrue, 480 F. App'x 773, 776 (5th Cir. 2012) (citing Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir.

2005)); Stringer v. Astrue, 465 F. App'x 361, 363 (5th Cir. 2012) (citing Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002)).   Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Richard ex rel. Z.N.F., 480 F. App'x at 776; Stringer, 465 F. App'x at 363-64; Perez, 415 F.3d at 461.  This court may not reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision.  Halterman ex rel. Halterman v. Colvin, No. 12-31099, 2013 WL 5913945, at *2 (5th Cir. May 9, 2013) (citing Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000)); Stringer, 465 F. App'x at 364.   The Commissioner, rather than the courts, must resolve conflicts in the evidence.  Luckey v. Astrue, 458 F. App'x 322, 324 (5th Cir. 2011) (citing Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990)); Newton, 209 F.3d at 452.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Joubert v. Astrue, 287 F. App'x 380, 382 (5th Cir. 2008) (citing Perez, 415 F.3d at 461).  Any findings of fact by the Commissioner that are

supported by substantial evidence are conclusive.  Ray v. Barnhart, 163 F. App'x 308, 311 (5th Cir. 2006) (citing Perales, 402 U.S. at 390); Perez, 415 F.3d at 461.

To be considered disabled and eligible for SSI or DIB,[1] plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2012).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.[2]  Id. §§ 404.1520, 416.920;

---

[1]The relevant law and regulations governing claims for DIB and SSI are identical.  Carmon v. Barnhart, 81 F. App'x 410, 411 n.1 (3d Cir. 2003) (citing Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994)); Baltierra v. Chater, 70 F.3d 1268, 1995 WL 696740, at *1 (5th Cir. Oct. 19, 1995) (citing Haywood v. Sullivan, 888 F.2d 1463, 1467 (5th Cir. 1989)); Bryan v. Halter, 252 F.3d 1357, 2001 WL 422878, at *1 (5th Cir. Apr. 5, 2001) (citing Haywood, 888 F.2d at 1467).

[2]The five-step analysis requires consideration of the following:
First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).
Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).
Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).
Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Alexander v. Astrue, 412 F. App'x 719, 720 (5th Cir. 2011) (citing Audler v. Astrue, 501 F.3d 446, 447 (5th Cir. 2007)); Perez, 415 F.3d at 461. The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. Id.

The claimant has the burden of proof under the first four parts of the inquiry. If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing. When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding. Alexander, 412 F. App'x 720-21; Perez, 415 F.3d at 461.

The court weighs four elements of proof when determining whether there is substantial evidence of disability: "'(1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history.'" Chrisner v. Astrue, 249 F. App'x 354, 356 (5th Cir. 2007) (quoting Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991)); accord Perez, 415 F.3d at 463.

―――――――――――――

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. Id. §§ 404.1520(f)(1), 416.920(f)(1). To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

B.    Factual Background

Plaintiff's attorney stated in his opening statement that Millet is trying to work in a tree trimming business, but is working about one day per week at a level less than substantial gainful activity, making less than $100 per week. (Tr. 57). Plaintiff testified that he is 53 years old and completed the sixth grade. He said he works a little when he can, but often cannot work because he is in too much pain. He stated that he works on the ground picking up and "trying to pull heavy objects like trees, or stuff like that," and handling chainsaws. (Tr. 58).

Plaintiff said he worked as a deckhand for most of his adult life. He testified that he stopped working full-time in 2009, but has tried to work a little since then when he can. (Tr. 59). He said that tree-trimming and lawn-mowing are the only types of work he has done since April 2011. (Tr. 62). He stated that he chose April 15, 2011, as his alleged disability onset date because that is when he could not do anything any more and decided to try for Social Security benefits. (Tr. 59-60).

The ALJ noted that Millet received unemployment benefits in 2011. Plaintiff testified that he received benefits for almost two years, but could not remember when they stopped. (Tr. 60-61). He explained that he was laid off from American Tugs when the employer sold the boat on which he worked. He thought that he was laid off in the summer of 2009 and received unemployment benefits until almost two years later. He admitted receiving some of these benefits after his alleged disability onset date. (Tr. 61).

Millet testified that he cannot work because of constant pain and because his legs swell when he stands for too long.  He said he gets "some red stuff" that is bloodshot and swollen all the way down his legs and he can hardly walk after that.  He confirmed that this condition was diagnosed as vascular autoimmune disease, but said he had not heard it called "purpura,"[3] when the ALJ quoted that term from the medical records.

Plaintiff explained that he suffers from back and leg pain as a result of some accidents.  He said he tripped over a hose and fell from the wheelhouse to the deck of a tugboat in 2004.  (Tr. 62-63).  When the ALJ asked what treatment Millet has received for his back and leg complaints since April 2011, plaintiff stated that he currently has appointments at LSU Hospital with dermatology and rheumatology and with his primary care provider for his hepatitis and for lab tests, and that his appointments had been postponed because of the recent hurricane.[4]  (Tr. 63).

For his leg pain, Millet said he sees Dr. Chambers, who is no longer at Westbank Health Care Center, where Dr. Chambers treated Millet after his first accident.  Plaintiff stated that Dr. Chambers has an office in Belle Chasse, Louisiana.  (Tr. 64).  Millet said

---

[3]This word was misstated in the transcript as "percurum (phonetic)."  Purpura is "any of several hemorrhagic states characterized by patches of purplish discoloration resulting from extravasation [infiltration or infusion from a proper vessel or channel into surrounding tissue] of blood into the skin and mucous membranes."  MedlinePlus Medical Dictionary (Merriam-Webster, Incorporated 2015), http://www.merriam-webster.com/medlineplus/Purpura; http://www.merriam-webster.com/medlineplus/extravasate.

[4]Hurricane Isaac made landfall at Southwest Pass, Louisiana, on August 28, 2012.  Robbie Berg, "Tropical Cyclone Report, Hurricane Isaac," at p. 2 (National Hurricane Center, Jan. 28, 2013), http://www.nhc.noaa.gov/data/tcr/AL092012_Isaac.pdf (visited Oct. 14, 2015).

he has been going to Westbank Health Care since he was in a car accident in 2011.[5]  He stated that he currently sees Dr. James Dyess[6] at his office in Gretna, Louisiana, since he was in another car accident on September 1, 2012.  He said he is undergoing "therapy and all that" as a result of his most recent accident, but that he has had back troubles for 15 years.  (Tr. 65, 67).

Millet testified that he was seen at the West Jefferson Hospital emergency room for a rash when it first appeared and at LSU/Charity Hospital Clinic in July 2011 for the same problem.  (Tr. 66).  When the ALJ asked if he had received any other treatment between January and September 2012, plaintiff said he had "just been going in and out of the emergency rooms" at LSU and West Jefferson Hospital.  (Tr. 67-68).  He stated that he went to the emergency room three to four times because his legs were swollen and that he once had to go by ambulance because he could not walk.  He testified that the emergency room doctors tested his blood, but could not find anything wrong.  He said the doctors gave him "Flexeril,[7] or something like that" for pain and to reduce swelling.

---

[5]Plaintiff's testimony is unclear about the time or type of this accident.  According to the medical records from Westbank Health Care Center, he was involved in a car accident on February 4, 2011, and first sought treatment at that facility on February 9, 2011.  (Tr. 274).

[6]According to the medical records, plaintiff was treated by James Dyess, M.D.  The doctor's name is mistranscribed in the transcript as "Diaz [phonetic]."

[7]Flexeril (generic name:  cyclobenzaprine) "is a muscle relaxant used in combination with rest and physical therapy for the relief of severe and painful conditions, such as muscle spasms due to sprains, strains, or pulls."  PDRhealth (PDR Network, LLC 2015), http://www.pdrhealth.com/drugs/flexeril (visited Oct. 14, 2015).

(Tr. 68).  He said that the medication worked for a while, but that his condition came back when he finished it.  He testified that he then decided to see Dr. Chambers, who is also his pastor, but he has not seen Dr. Chambers in more than a year.

Plaintiff stated that he was diagnosed with hepatitis A, B and C, but has not been treated for it.  He said he was then waiting to see his primary care physician, but he is supposed to have lab work done first and then have a liver biopsy at LSU in the middle of October 2012.  (Tr. 69).  He testified that he has had hepatitis since the 1970s, but never received treatment for it, and it has worsened.  He said that hepatitis A, B and C were diagnosed when he was arrested and went to Orleans Parish Prison about two years ago.  (Tr. 70-71).

Millet testified that he has bipolar disorder and has been treated for it by Dr. Michael Tran at East Jefferson Medical Center.  He stated that he had been seeing Dr. Tran to try to stop abusing pain pills and that Dr. Tran also prescribed medication for depression and anxiety.  Plaintiff said he had recently released himself from Dr. Tran's care so he could go back to Dr. Chambers, whose office is closer to his home.  (Tr. 71).  He stated that his last visit to Dr. Tran was about one month earlier, and that he had seen Dr. Tran monthly for six or more months before that.  He said he used to see Dr. Gonzales at Chartres-Pontchartrain Clinic, but stopped going there in 2009 because he moved to the Westbank and did not have transportation.  (Tr. 72-73).

Plaintiff testified that he had a significant history of drug and alcohol abuse that ended a couple of years ago.  He said he is about to enter phase three of drug court and he is tested for drug use all the time.  (Tr. 73-74).  He stated that his last drug test was the previous week and it was clean.  He testified that he used cocaine after the recent hurricane because he had no money and was depressed after he and his girlfriend separated.  He stated that cocaine showed up in his drug test results about three weeks earlier.  He said he had pawned a chainsaw to obtain money to buy cocaine.  (Tr. 74-75).

Millet testified that he "kind of quit" drinking alcohol, by which he meant that he only drinks once in a while, but not as much as he used to do.  He said that alcohol is not a problem for him now.  He stated that he was treated for alcohol abuse at Bethel Colony and LSU Detox many years earlier.  (Tr. 75).  He testified that he "turned the corner" in 2009 and has been clean for two years, other than the small relapse a few weeks ago.

Plaintiff stated that he has taken medication off and on for mental health problems. He said he does not always take the medicine because he does not like how it makes him feel.  He testified that Depakote was the only medication that had helped him, but he could not take it "because it was eating my liver away" as a result of his hepatitis.  He said that Dr. Gonzales told him this after reviewing his blood tests.  (Tr. 76-77).

Millet testified that he takes a drug to help him with his opiate addiction, but that he cannot take Lorcet[8] because it would show up as positive on his drug test for the drug court.  He stated that Dr. Dyess prescribes 800 milligrams of ibuprofen for him instead.  He said he has participated in the Orleans Parish drug court for one year.  He stated that he goes to classes there on Thursdays and Fridays for two hours each day.  (Tr. 77-78).  He said he will attend class only once a week after he moves to phase three and that he is about halfway through the four phases of the program.  He testified that he has to take a drug test in the courtroom whenever his "color comes up green."  He could not explain what that meant, except that each phase has a different color.  (Tr. 78-79).

Plaintiff testified that he was on methadone[9] for five years for chronic pain.  He said he became involved in drug court because he had some methadone pills that were not in a prescription bottle, although he had a prescription for it.  He stated that he was arrested for possession of methadone about one and one-half years ago.  Millet said he had brought the prescription to court, but it was a year old, so he was sentenced to drug court.  He said he has "left the methadone alone" and been compliant with drug court

---

[8]Lorcet (generic name:  hydrocodone) is a combination of acetaminophen and the opioid pain medication hydrocodone bitartrate.  It is used for the relief of moderate to moderately severe pain.  Id., http://www.pdrhealth.com/drugs/lorcet (visited Oct. 14, 2015).

[9]Methadone is an opioid medication that "reduces withdrawal symptoms in people addicted to heroin or other narcotic drugs without causing the 'high' associated with the drug addiction."  It is also "used as a pain reliever and as part of drug addiction detoxification and maintenance programs."  Drugs.com, http://www.drugs.com/methadone.html (visited Oct. 14, 2015).

requirements since then.  He testified that he was only in jail for a few days.  (Tr. 79-80).
He stated that he fought the charge for 14 months.

Millet said that pain in his legs limits him to walking about one-fourth of a block
before he has to stop.  He testified that he does not use a cane or other assistive device.
He stated that his left leg gave out that morning and he fell in front of his house and cut
his leg as he came off the porch.  (Tr. 81).  He estimated that he could stand for 20 to 30
minutes.  He stated that his lower back was hurting from sitting during the hearing.  He
said he can sit for about 20 minutes and can only watch television if he lies down.

Plaintiff testified that he has been struggling to support himself for at least 18
months, since he has not been working.  He said he lives in his brother's house and has
been trying find roommates to help pay the house note and expenses.  (Tr. 82).  He said
he does odd jobs.  He stated that all of his roommates have moved on at this time, so he
will probably lose the house.  He said he lives alone with his Chihuahua dog.  He said
he is unable to cut the grass, which has grown high since the hurricane.

Millet stated that he is always in pain and wishes he could work, because he has
worked all his life since he was 15 years old.  He said he used to make $150 to $200 a
day working on a tugboat, but his tugboat career is finished.  (Tr. 83-84).

Plaintiff testified that he asked the drug court to place him in a GED program.  He
said he asked his caseworker to give him a little more time because he has been trying

to get on disability.  He stated that his caseworker said he should be able to get in the program in a few weeks.  (Tr. 84).

Millet said he cannot stand for long.  He testified that he did a little work two days ago, and that a rash with swelling broke out on his right leg.  He stated that this happens whenever he stays on his feet for too long.  He said he has aching pain from his back all the way down his legs and his fingers ache so much that he cannot move them.  He stated that his legs swell so that he can hardly walk.  (Tr. 85-86).

Plaintiff testified that Drs. Chambers and Tran used to give him steroids, "but you can't live on steroids."  He said Dr. Dyess prescribes ibuprofen and something else for his bad muscle spasms.  He stated that he goes to physical therapy twice a week.  He said he lives in a two-story house and has to stop halfway up the stairs to catch his breath and ease the pain.  He stated that he had gone upstairs two to three times that morning because he had forgotten something and it "like to kill me." (Tr. 86-87).  He testified that he lies down and takes it easy for a couple of hours in the middle of the day because he gets very tired.

Millet stated that he broke both his ankles in the late 1970s or early 1980s and that his right ankle did not heal properly.  He said that his right ankle grew back sideways and that he wears out a pair of tennis shoes in a week because he walks sideways on the right shoe.  He testified that he receives no treatment for his ankle problem.  (Tr. 87-88).  He stated that it started bothering him about ten years ago.  He said he has a lot of doctors'

14

appointments coming up and would like to start seeing Dr. Chambers regularly again, if he could pay for the visits.  (Tr. 88-89).

C.    Vocational Expert Testimony

A vocational expert, Patricia Riggle, testified that plaintiff's past relevant work as a deckhand is semi-skilled and usually classified as heavy, but was very heavy as he performed it.  She said that he had no transferable skills to other skilled work.  (Tr. 90).

The ALJ posed a hypothetical of a person with plaintiff's age, education and work experience who can do light work, but cannot climb ladders, ropes or scaffolds; can occasionally balance, kneel, crouch, crawl and climb ramps and stairs; cannot work at heights or around dangerous machinery; and must avoid concentrated exposure to extreme temperatures and to environmental irritants.  Riggle testified that such a person could not perform plaintiff's past relevant work.  She stated that he could perform unskilled jobs such as dishwasher; cleaner, housekeeping; and janitor/cleaner, which are available in significant numbers in Louisiana and the national economy.  (Tr. 90-91).

The ALJ modified the hypothetical by adding that the person must alternate sitting and standing every hour for approximately five minutes, without leaving the work station.  Riggle said that this person could not perform any of the jobs she had previously identified or any other jobs, because of his lack of transferable skills and his educational level.  (Tr. 91).

15

Plaintiff's attorney asked Riggle to consider the ALJ's first hypothetical and add a limitation that pain frequently interferes with the person's ability to concentrate on job tasks.  Riggle testified that if pain frequently causes an employee not to complete tasks in a timely manner and sometimes not to show up for work, the individual could not maintain employment.  When the attorney added a restriction that the person must lie down at unscheduled times for at least two hours in an eight-hour day, Riggle stated that no jobs would be available.  (Tr. 92).

When plaintiff's attorney asked the ALJ for a clarification of her first hypothetical, the ALJ noted that she had failed to include a limitation of occasional stooping.  When the ALJ added that restriction to the first hypothetical question, Riggle testified that her answer did not change.  (Tr. 94-95).

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 41-45).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.    Plaintiff's Appeal

    1.    The ALJ applied the proper legal standard when assessing plaintiff's residual functional capacity and the finding is supported by substantial evidence.

Plaintiff argues that the ALJ failed in her obligation to develop the facts fairly and fully. "The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure that [her] decision is an informed decision based on sufficient facts." Brock v. Chater, 84 F.3d 726, 728 (citation omitted). Millet contends that substantial evidence in the record, including his own reports to his medical providers and his own credible testimony, establish that he has additional limitations that the ALJ failed to include in her assessment of his residual functional capacity. Specifically, he argues that the ALJ failed to incorporate his need to alternate between sitting and standing; his difficulties maintaining concentration, persistence and pace; and his need to lie down at unscheduled times for at least two hours during the work day.

Millet argues that the record documents his complaints of pain in his lower back that radiates to his legs, which became more persistent after his car accident in February 2011. He contends that his complaints are supported by diagnoses of cervical, trapezius and lumbar strains and chronic lower back pain and by objective medical evidence of decreased range of motion, tenderness and spasms in his cervical and lumbar spine and a lumbar x-ray taken on December 27, 2011, that shows a degenerative fifth lumbar disc. Plaintiff asserts that the medical evidence also supports his complaints of pain and

swelling in his legs due to his vascular autoimmune disorder and of alterations to his gait because of an old, right ankle fracture with x-ray evidence[10] of incomplete union of the medial malleolus[11] and a bone spur on his heel.

Plaintiff does not identify any particular evidence that the ALJ did not consider. The ALJ expressly stated that she considered all of the evidence, and the court assumes that her statement is accurate. Brunson v. Astrue, 387 F. App'x 459, 461 (5th Cir. 2010); Hammond v. Barnhart, 124 F. App'x 847, 851 (5th Cir. 2005). Millet's arguments essentially amount to a contention that the ALJ should have weighed the evidence differently.

The mere diagnosis of an impairment, such as a lumbar strain, degenerative disc disease or vascular autoimmune disorder, does not establish a claimant's disability claims. Bordelon v. Astrue, 281 F. App'x 418, 421 (5th Cir. 2008) (citing Hames v. Heckler, 707 F.2d 162, 165 (5th Cir. 1983)); McLendon v. Barnhart, 184 F. App'x 430, 431(5th Cir. 2006); Harris v. Barnhart, No. 02-55540, 2003 WL 21054733, at *2 (9th Cir. 2003); Estok v. Apfel, 152 F.3d 636, 640 (7th Cir. 1998); Jones v. Sullivan, 954 F.2d 125, 128 (3d Cir. 1991); Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 87-88

---

[10]Although the report of the x-ray taken on December 27, 2011, says that it was of plaintiff's left ankle (Tr. 282), all the other evidence, including the report of examination the same day by the consultative examiner, Miljana Mandich, M.D., who ordered the x-ray, indicate that Millet's problem is in his right ankle.

[11]The medial malleolus is "a strong pyramid-shaped process of the tibia [shinbone] that projects distally on the medial side of its lower extremity at the ankle." MedlinePlus Medical Dictionary, http://www.merriam-webster.com/medlineplus/malleolus.

(1st Cir. 1991); <u>Martin v. Chater</u>, No. 95 C 0245, 1995 WL 505955, at *6 (N.D. Ill. Aug. 23, 1995) (citing <u>Anderson v. Sullivan</u>, 925 F.2d 220, 222 (7th Cir. 1991)).  Plaintiff "'must show that [he] was so <u>functionally impaired</u> [by his diagnosed impairments] that [he] was precluded from engaging in any substantial gainful activity.'"  <u>Bordelon</u>, 281 F. App'x at 422 (quoting <u>Hames</u>, 707 F.2d at 165) (emphasis added); <u>accord</u> <u>Taylor v. Astrue</u>, 706 F.3d 600, 603 (5th Cir. 2012); <u>Randall v. Astrue</u>, 570 F.3d 651, 658-59 (5th Cir. 2009); <u>Anthony v. Sullivan</u>, 954 F.2d 289, 293 (5th Cir. 1992); <u>Hamauei v. Astrue</u>, No. 10-85, 2011 WL 802398, at *7 (E.D. La. Feb. 28, 2011) (quoting <u>Hames</u>, 707 F.2d at 165).

In addition, "[w]hile pain can be disabling, it is not an automatic ground for entitlement to disability benefits.  Pain is recognized as a disabling condition under the Act only where it is constant, unremitting, and wholly unresponsive to therapeutic treatment.  The test for disability under the Act is not satisfied merely because Plaintiff cannot work without some pain or discomfort." <u>Alvarez v. Colvin</u>, No. 3:12-CV-03569-BK, 2013 WL 1858197, at *7 (N.D. Tex. May 3, 2013) (citing <u>Hames</u>, 707 F.2d at 166); <u>accord</u> <u>Nugent v. Astrue</u>, 278 F. App'x 423, 427 (5th Cir. 2008) (citing <u>Cook v. Heckler</u>, 750 F.2d 391, 395 (5th Cir. 1985)); <u>Beck v. Barnhart</u>, 205 F. App'x 207, 212 (5th Cir. 2006) (citing <u>Cook</u>, 750 F.2d at 395).

Subjective complaints of pain or other symptoms must be corroborated by objective medical evidence, <u>Quijas v. Astrue</u>, 298 F. App'x 391, 393 (5th Cir. 2008)

(citing Chambliss, 269 F.3d at 522); Harper v. Sullivan, 887 F.2d 92, 96 (5th Cir. 1989), and such complaints may be discounted when the alleged symptoms are not consistent with the objective medical evidence.  Brown v. Astrue, 344 F. App'x 16, 21 (5th Cir. 2009); Hernandez v. Astrue, 278 F. App'x 333, 340 (5th Cir. 2008); Dunbar v. Barnhart, 330 F.3d 670, 672 (5th Cir. 2003).

It is within the ALJ's discretion to determine the disabling nature of a claimant's pain, and the ALJ's determination is entitled to considerable deference.  Jenkins v. Astrue, 250 F. App'x 645, 647 (5th Cir. 2007) (citing Chambliss, 269 F.3d at 522). Whether a claimant is able to work despite some pain is within the province of the ALJ, and the determination should be upheld if supported by substantial evidence.  Id. (citing Chambliss, 269 F.3d at 522; Falco v. Shalala, 27 F.3d 160, 164 (5th Cir. 1994)).

Determining the credibility of plaintiff's subjective evidence of pain and disability is also a necessary part of the ALJ's consideration of the evidence.  Luckey, 458 F. App'x at 326 (citing Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); Perez, 415 F.3d at 462. The ALJ is bound to explain her reasons for rejecting a claimant's subjective complaints, but "is not required to 'follow formalistic rules in [her] articulation.'" Hernandez, 278 F. App'x at 339 (quoting Falco, 27 F.3d at 164).  The ALJ has the responsibility to evaluate the credibility of witnesses, Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002), and "credibility conclusions are 'precisely the kinds of determinations that the ALJ is best positioned to make.'" Spruill v. Astrue, 299 F. App'x

20

356, 358 (5th Cir. 2008) (quoting Falco, 27 F.3d at 164).  Thus, the ALJ's credibility

evaluation is entitled to considerable deference by this court.  McKnight v. Astrue, 340

F. App'x 176, 181 (5th Cir. 2009) (citing  Newton, 209 F.3d at 459); Bedford v. Astrue,

236 F. App'x 957, 962 (5th Cir. 2007) (citing  Newton, 209 F.3d at 459).  The ALJ is

required only to review the entire record, resolve conflicts in the evidence and state

specific reasons for his credibility findings, supported by the evidence.  Luckey, 458 F.

App'x at 324; Giles v. Astrue, 433 F. App'x 241, 249 (5th Cir. 2011); Newton, 209 F.3d

at 452.  The ALJ's explanation of her reasons for finding plaintiff not entirely credible

is all that is necessary.  James J. Flanagan Stevedores, Inc. v. Gallagher, 219 F.3d 426,

430 & n.8 (5th Cir. 2000) (citing Falco, 27 F.3d at 163); Godbolt v. Apfel, No. 98-1680,

1999 WL 179476, at *9 (E.D. La. Mar. 31, 1999).

 In the instant case, the ALJ explained why she found that plaintiff's subjective

symptoms and alleged limitations were not credible and were inconsistent with the

evidence as a whole.  (Tr. 40-41, 45-46, 47-48).  Her reasons for discounting Millet's

credibility are substantially supported by the record.

 The ALJ cited several factors that diminished plaintiff's credibility.  Among them

were his activities of daily living, his ability to live independently and his ability to work

one day per week trimming trees, which, according to plaintiff's own testimony, included

handling a chainsaw and hauling heavy tree branches.  The ALJ observed that Millet sat

at the hearing for 45 minutes, despite his testimony that he could sit for only 20 minutes

without difficulty.   Another factor influencing the ALJ's assessment of plaintiff's credibility was his "generally unpersuasive appearance and demeanor while testifying." (Tr. 47).   "While <u>exclusive</u> reliance upon demeanor in credibility determinations is inappropriate, it is <u>not</u> reversible error for an ALJ to consider demeanor as one of several factors in evaluating a claimant's credibility."   <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1024 (5th Cir. 1990) (citations omitted) (emphasis added); <u>accord</u> <u>Taylor v. Apfel</u>, 172 F.3d 870 (5th Cir. 1999); <u>Schnorr v. Bowen</u>, 816 F.2d 578, 582 (11th Cir. 1987).

The ALJ also noted that Millet testified that he had relapsed on cocaine only once, about three weeks before the October 11, 2012, hearing, and that his drug tests were clean while he was under the care of Dung Michael Tran, M.D., at East Jefferson Family Practice between January 23, 2012, and August 3, 2012.   However, the ALJ found that this testimony directly conflicted with Dr. Tran's records, which contain a positive drug screen during that treatment period, and that this conflict "bears strongly upon the claimant's credibility." (Tr. 48).   Dr. Tran's records confirm that Millet had a drug test that was positive for cocaine at his first visit on January 23, 2012.   (Tr. 301, 314[12]).

--------

[12]As the ALJ noted, the drug test result at p. 314 mistakenly uses Millet's date of birth as the date of the test.   Because this is the only test result in the records that was positive for cocaine, which coincides with Dr. Tran's treatment note to that effect on January 23, 2012, and because all the other drug tests in the record were done on other days when plaintiff saw Dr. Tran, I assume that the positive test was done on January 23, 2012.   At a minimum, as the ALJ noted, the test was done while plaintiff was under Dr. Tran's care.

Millet testified that he was laid off in 2009.  He did not testify that he stopped working because of medical problems.  Another factor the ALJ noted with respect to plaintiff's credibility was that he collected unemployment benefits through the fourth quarter of 2011, nine months <u>after</u> his alleged disability onset date, which meant that he held himself out as able to work and was required to actively seek work during that time.  Although a claimant's receipt of unemployment benefits does not preclude a finding of disability, "it is appropriate for the ALJ to consider any representations he has made to state authorities and prospective employers that he can work."  <u>Knox v. Astrue</u>, 327 F. App'x 652, 656 (7th Cir. 2009) (citing <u>Schmidt v. Barnhart</u>, 395 F.3d 737, 746 (7th Cir. 2005)); <u>accord</u> <u>Thibodeaux v. Astrue</u>, 324 F. App'x 440, 444 (5th Cir. 2009); <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1161-62 (9th Cir. 2008) (citing <u>Schmidt</u>, 395 F.3d at 745-46; <u>Copeland v. Bowen</u>, 861 F.2d 536, 542 (9th Cir. 1988)).  "Applications for unemployment and disability benefits are inherently inconsistent.  There is 'no reasonable explanation for how a person can claim disability benefits under the guise of being unable to work, and yet file an application for unemployment benefits claiming that [he] is ready and willing to work.'"  <u>Workman v. Comm'r of Soc. Sec.</u>, 105 F. App'x 794, 801 (6th Cir. 2004) (quoting <u>Bowden v. Comm'r</u>, No. 97-1629, 1999 WL 98378, at *7 (6th Cir. Jan. 29, 1999)) (citing <u>Kinsella v. Schweiker</u>, 708 F.2d 1058, 1059 (6th Cir. 1983)).

The ALJ incorporated into her residual functional capacity assessment all of plaintiff's functional limitations that she found credible. Based on her credibility findings, the ALJ found that Millet's testimony that he suffers severe pain and must lie down for two hours each day was not substantially supported by the medical evidence and was insufficient to establish any additional limitations. The ALJ noted the minimal objective findings in plaintiff's medical records, the episodic and conservative nature of his treatment and the lack of any treatment by a mental health care professional. These findings are supported by substantial evidence.

Millet argues that the ALJ failed to mention that his treating physician, Michael Chambers, M.D., restricted him from working for some months after his first automobile accident on February 4, 2011. However, Dr. Chambers's treatment records show that he restricted plaintiff from working only from February through July 2011. (Tr. 267-72). Dr. Chambers discharged Millet from his care at plaintiff's request on September 7, 2011, when plaintiff reported that his lower back pain was "back to baseline." On physical examination, Millet's cervical and lumbar range of motion were within normal limits. His lumbar pain was at an improved level since his initial visits, with no spasm and a negative straight leg raising test bilaterally. Dr. Chambers advised plaintiff to seek treatment by a specialist if necessary. (Tr. 265). There is no evidence that he did so. Dr. Chambers also noted on September 7, 2011, that an MRI was pending, but there is no evidence that one was ever performed. (Tr. 265).

On both August 3, 2011, and September 7, 2011, Dr. Chambers checked a box on his progress notes for "Work Limitations: <u>No</u>." (Tr. 265-66). When he discharged Millet on September 7, 2011, Dr. Chambers wrote after the "Work Limitations: <u>No</u>" box: "but current activity restrict__." The word "restrict__" (and/or any additional words) appears to be cut off at the side of the page. <u>Id.</u> Millet argues that this note establishes that Dr. Chambers released him <u>with</u> continued restrictions. However, the medical evidence is not clear what those restrictions, if any, are. Dr. Chambers clearly indicated that plaintiff was <u>not</u> limited from <u>working</u> on both August 3 and September 7, 2011. The ALJ resolved this conflict, if any, in the medical evidence by stating that Dr. Chambers released Millet to work without any restrictions. (Tr. 44).

Plaintiff did not seek medical treatment for another four months, when he began care with Dr. Tran on January 23, 2012. Dr. Tran noted that Millet had a history of opioid dependency, cocaine use, recovery from alcohol abuse, anxiety and hepatitis B. He stated that Millet had a positive urine drug test and had recently relapsed with cocaine, but not with pain medications. Plaintiff's physical and mental status examinations on that date were within normal limits, including his neck, extremities, gait, stance, strength, skin (<u>i.e.</u>, no rash or lesions), mood and affect. Dr. Tran diagnosed drug dependency, not otherwise specified, and began treating Millet with Suboxone[13] for his

---

[13]Suboxone (generic name: buprenorphine) is a narcotic used for maintenance treatment of opioid dependence. <u>PDRhealth</u>, http://www.pdrhealth.com/drugs/suboxone (visited Oct. 13, 2015).

drug dependency and Naprosyn[14] for pain.  Dr. Tran referred plaintiff to LSU Hospital

Clinic for hepatitis B and pain management.  (Tr. 301).  There is no evidence that Millet

ever followed up on these referrals.

At subsequent monthly visits to Dr. Tran through August 3, 2012, Millet's

physical examinations were consistently within normal limits, except that he was initially

noncompliant with his blood pressure medications.  Dr. Tran regularly noted that plaintiff

was "doing well."  (Tr. 302-09).  Although Dr. Tran did not formally diagnose anxiety

or depression, he prescribed Atarax[15] for plaintiff's complaints of anxiety on February 6,

2012, and also prescribed Celexa.[16]   On May 11, 2012, plaintiff complained of leg

spasms and Dr. Tran prescribed Flexeril.  (Tr. 306).  On June 8 and July 6, 2012, Millet

told Dr. Tran that he had taken some of his brother's Soma[17] for muscle spasms in his

---

[14]Naprosyn (generic name: naproxen) is a nonsteroidal anti-inflammatory drug used to treat pain, swelling, and inflammation from medical conditions such as arthritis, tendonitis, gout, ankylosing spondylitis (arthritis of the spine) and bursitis.  Id., http://www.pdrhealth.com/drugs/naprosyn (visited Oct. 15, 2015).

[15]Atarax (generic name:  hydroxyzine) reduces activity in the central nervous system.  It is used as a sedative to treat anxiety and tension, and is also used to treat allergic skin reactions, such as hives or contact dermatitis.  Drugs.com (rev. 12/3/2013), http://www.drugs.com/atarax.html (visited Oct. 15, 2015).

[16]Celexa is a selective serotonin reuptake inhibitor that is used to treat depression.  PDRhealth, http://www.pdrhealth.com/drugs/celexa (visited Oct. 19, 2015).

[17]Soma (generic name: carisoprodol) is "used to relieve discomfort associated with short-term, painful musculoskeletal conditions."  Id., http://www.pdrhealth.com/drugs/soma (visited Oct. 19, 2015).

back.  Dr. Tran prescribed Neurontin[18] and Zanaflex,[19] and Millet reported on the second of those visits that Neurontin worked.  (Tr. 307-08).  On August 3, 2012, Millet told Dr. Tran that he wanted to return to Dr. Chambers for his Suboxone treatment.  (Tr. 309). On August 23, 2012, Dr. Tran released plaintiff.  (Tr. 299).  There is no evidence that Millet returned to see Dr. Chambers after that date.

Plaintiff's testimony that he frequently went to hospital emergency rooms for treatment is not supported by the medical records, which reflect only one such visit to the Medical Center of Louisiana–New Orleans on July 19, 2011.  At that visit, Millet told James B. Aiken, M.D., that his primary care provider had referred him to the emergency room for a rash which had appeared in his lower extremities on and off for a year, had resolved with various antibiotics and steroids, but always returned.  Plaintiff had no complaints of joint pain.  His physical examination was normal, except for a purplish, non-tender rash to his lower extremities from his groin to his feet and mild pitting edema[20] to his lower legs.  Lab test results were unremarkable.  Dr. Aiken's impression

---

[18]Neurontin (generic name: gabapentin) is used to help relieve certain types of nerve pain.  Id., http://www.pdrhealth.com/drugs/neurontin (visited Oct. 19, 2015).

[19]Zanaflex (generic name:  tizanidine) is a muscle relaxer used to manage muscle spasms.  Id., http://www.pdrhealth.com/drugs/zanaflex (visited Oct. 19, 2015).

[20]"Edema is swelling of soft tissues due to increased interstitial fluid. . . .  [Pitting is] visible and palpable depressions caused by pressure from the examiner's fingers on the edematous area, which displaces the interstitial fluid."  Merck Manual (rev. Aug. 2014 by Lyall A.J. Higginson, M.D.), http://www.merckmanuals.com/professional/cardiovascular-disorders/symptoms-of-cardiovascular-di sorders/edema (visited Sept. 25, 2015).

was purpura, etiology unknown.  Dr. Aiken prescribed steroids and referred Millet to both rheumatology and dermatology for followup.  (Tr. 254).  An ANA (antinuclear antibody) test the same date, which Dr. Aiken apparently did not see before Millet was discharged, was abnormal.[21]  (Tr. 256).  According to plaintiff's testimony, he did not have appointments with the rheumatology and dermatology clinics until late August 2012, more than one year later.  (Tr. 63).

A claimant's lack of need for strong medication or a failure to seek treatment are relevant factors to consider in determining the severity of an alleged impairment and may be used in conjunction with the medical reports to discount plaintiff's complaints of disabling pain or other limitations.  Clayborne v. Astrue, 260 F. App'x 735, 737 (5th Cir. 2008); Doss v. Barnhart, 137 F. App'x 689, 690 (5th Cir. 2005); Bryan v. Halter, 252 F.3d 1357, 2001 WL 422878, at *2 (5th Cir. Apr. 5, 2001) (citing 20 C.F.R. §§ 404.1530, 416.930; Wren v. Sullivan, 925 F.2d 123, 128 (5th Cir. 1991)); Austin v. Apfel,  205 F.3d 1338, 1999 WL 1338401, at *1 (5th Cir. 1999) (citing Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991)).

---

[21]ANA are a group of autoantibodies produced by a person's immune system when it fails to adequately distinguish between "self" and "nonself."  The antibodies target substances found in the nucleus of a cell and cause organ and tissue damage.  A positive ANA test means that autoantibodies are present and suggests the presence of an autoimmune disease in a person with signs and symptoms associated with a systemic autoimmune disorder.  Lab Tests Online (Am. Ass'n for Clinical Chemistry 2015), https://labtestsonline.org/understanding/analytes/ana/tab/test (visited Oct. 13, 2015).

Contrary to plaintiff's argument, the ALJ's failure to mention his second motor vehicle accident does not undermine a finding that substantial evidence supports the ALJ's residual functional capacity assessment.   The second accident occurred on September 1, 2012, sixteen months after Millet's alleged disability onset date of April 15, 2011.  Plaintiff first sought treatment from Dr. Dyess for injuries suffered in this accident on September 10, 2012, just one month before the administrative hearing in this case, with a followup visit on September 27, 2012, which is the last medical report in the administrative record.

Millet told Dr. Dyess at his first visit that he had experienced chronic lower back pain before the accident at a level of four to six out of ten on a scale of zero to ten, while his current pain level was nine out of ten.  Plaintiff also complained to Dr. Dyess of left arm and bilateral upper shoulder pain, which are new symptoms that do not appear in the medical records before that date.  Dr. Dyess found decreased range of motion with pain in plaintiff's cervical and lumbar spines.  He assessed Millet with a cervical/lumbar strain, disc injury at C5-6 or C6-7, triceps and biceps muscle strain in the left arm and an "acute exacerbation" of chronic lower back pain.  Dr. Dyess prescribed physical therapy and medications, and restricted Millet to no work.  (Tr. 317-22).

Dr. Dyess's diagnoses of acute exacerbation of plaintiff's lumbar and cervical spine conditions and a left arm strain caused by the September 2012 accident are not substantial evidence that Millet was disabled on his alleged onset date by a medical

impairment that had lasted or could be expected to last for not less than 12 months.  The doctor's opinion that Millet was unable to work on September 10, 2012, does <u>not</u> mean that plaintiff could not be expected to work for a continuous period of 12 months. Indeed, Dr. Dyess did not repeat the restriction at plaintiff's next visit on September 27, 2012.  (Tr. 316).

Finally, the ALJ appropriately relied on the report of the consultative examiner, Dr. Mandich, who examined Millet on December 27, 2011, and on the opinions of two non-examining state agency consultants who reviewed plaintiff's medical records.  With the exception of mildly limited dorsiflexion and slight hypertrophy[22] in plaintiff's right ankle, Dr. Mandich's thorough physical examination revealed normal findings.  Dr. Mandich observed that Millet had a normal gait and station; normal range of motion in his neck, spine and joints (other than the right ankle); negative straight leg raising test bilaterally; no rash or edema in the extremities; and an appropriate mental status examination.  The doctor diagnosed a history of drug and alcohol abuse, asymptomatic bipolar disorder, recurrent lower back pain without any physical findings, history of ankle fracture with mildly limited dorsiflexion and slight hypertrophy, asymptomatic autoimmune vasculitis of the legs and a reported diagnosis of hepatitis A, B and C, with no signs or symptoms of liver dysfunction.  (Tr. 283-87).  The x-rays that Dr. Mandich

---

[22]Hypertrophy is the "excessive development of an organ or part; <u>specifically</u>:  increase in bulk (as by thickening of muscle fibers) without multiplication of parts."  <u>MedlinePlus Medical Dictionary</u>, http://www.merriam-webster.com/medlineplus/hypertrophy.

ordered showed an old, right ankle fracture with incomplete union of the medial malleolus and a small bone spur on Millet's heel, and narrowing of the fifth lumbar interspace compatible with degenerative disc pathology, but no indication of spondylolisthesis[23] or other disease.  (Tr. 282).

Jeffrey Nugent, M.D., an orthopedist, reviewed plaintiff's medical records on January 25, 2012.  He found that plaintiff's neck sprain, lumbosacral sprain and left wrist contusion as a result of his first motor vehicle accident on February 4, 2011, had resolved as of his last visit to Dr. Chambers in September 2011, and that plaintiff's right ankle fracture, although un-united, was asymptomatic.  Dr. Nugent opined that plaintiff's lumbosacral sprain with preexisting lumbosacral degenerative disc disease and his right ankle fracture were both nonsevere impairments.  (Tr. 289).

Based on the opinions of Drs. Nugent and Mandich, a single decisionmaker at the state agency level (who is not an acceptable medical source) assessed Millet with the residual functional capacity to perform light work with certain postural limitations.  (Tr. 106-07).  The ALJ gave these findings "substantial weight" because they were generally consistent with the treatment records and overall record.  (Tr. 48).  The ALJ's assessment of plaintiff's residual functional capacity is substantially supported by the medical records and the opinions of Drs. Chambers, Tran, Mandich and Nugent.

---

[23]Spondylolisthesis is "forward displacement of a lumbar vertebra on the one below it and especially of the fifth lumbar vertebra on the sacrum producing pain by compression of nerve roots."  Id., http://www.merriam-webster.com/medlineplus/Spondylolisthesis.

A psychiatrist, Doris LeBlanc, M.D., reviewed Millet's medical records and completed a Psychiatric Review Technique on January 13, 2012.  She opined that plaintiff has an affective disorder and a substance addiction disorder, but that there is no medical evidence of a severe mental impairment.  She noted the absence of any evidence that Millet took medications for a psychiatric disorder or needed inpatient psychiatric treatment.  Dr. LeBlanc found no restrictions in plaintiff's activities of daily living as a result of these disorders and assessed him with only mild difficulties in maintaining social functioning and concentration, persistence and pace.  (Tr. 104-05).  The ALJ gave these findings "significant weight" and found that Millet has no severe mental impairment.  (Tr. 48).  Dr. Mandich's diagnosis of asymptomatic bipolar disorder is consistent with Dr. LeBlanc's findings.  Dr. Tran, a family practitioner, prescribed Atarax for plaintiff's complaints of anxiety and also prescribed Celexa on February 6, 2012, after Dr. LeBlanc rendered her opinions, but it remained true, as she had noted, that Millet never sought treatment with any mental health professional.  There is no evidence that Millet suffered more significant psychiatric limitations after Dr. LeBlanc rendered her opinion.

The ALJ's residual functional capacity findings are supported by substantial evidence as described above.  Accordingly, this assignment of error lacks merit.

2.    The ALJ's hypothetical to the vocational expert fully incorporated
plaintiff's disabilities that the ALJ found credible.

The ALJ found at the fifth step of the sequential evaluation that jobs exist in significant numbers that plaintiff can perform.  Plaintiff argues that the vocational expert's testimony in this regard is not substantial evidence upon which the ALJ could rely because the testimony did not fully incorporate his disabilities.

Once the ALJ determines plaintiff's residual functional capacity, she may rely on vocational expert testimony to reach conclusions about the specific requirements of a particular occupation.  Dominguez-Herrera v. Astrue, 334 F. App'x 651, 654 (5th Cir. 2009) (citing Vaughan v. Shalala, 58 F.3d 129, 132 (5th Cir. 1995)); Weary v. Astrue, 288 F. App'x 961, 967-68 (5th Cir. 2008); Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995).

The ALJ posed hypothetical questions to the vocational expert that accounted for plaintiff's age, education, work experience, and physical limitations, which the ALJ found to be credible.  The vocational expert testified that such a person could perform jobs such as dishwasher; cleaner, housekeeping; and janitor/cleaner.  Plaintiff was represented by counsel at the hearing, and his counsel also questioned the vocational expert.  An ALJ's hypothetical question is defective and will not be allowed to stand unless it reasonably incorporated all of the disabilities recognized by the ALJ, "and the claimant or his representative is afforded the opportunity to correct deficiencies in the

ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994); accord Vaught v. Astrue, 271 F. App'x 452, 456 (5th Cir. 2008); Boyd v. Apfel, 239 F.3d 698, 706-07 (5th Cir. 2001).

In the instant case, plaintiff's counsel questioned the vocational expert and posed a hypothetical of a person who has pain that frequently interferes with the ability to concentrate on job tasks. Riggle testified that if pain frequently causes an employee to not complete tasks in a timely manner and sometimes not show up for work, the individual could not maintain employment. When the attorney added a restriction that the person must lie down at unscheduled times for at least two hours in an eight-hour day, Riggle testified that such an individual would not be able to sustain any employment. However, the ALJ found that the record did not support the limitations posited by plaintiff's counsel.

As discussed above, substantial evidence supports the ALJ's finding that Millet does not suffer from such extreme limitations. Therefore, the ALJ was not required to include such restrictions in her hypothetical questions. Carey v. Apfel, 230 F.3d 131, 143 (5th Cir. 2000). The vocational expert's testimony in response to the ALJ's hypothetical questions is substantial evidence on which the ALJ could rely to determine

that plaintiff can perform work with the restrictions noted in her opinion.  Accordingly, this assignment of error lacks merit.

CONCLUSION

The ALJ applied the proper legal standard when assessing plaintiff's residual functional capacity and the ALJ's findings regarding that capacity are supported by substantial evidence.  The ALJ's hypothetical question to the vocational expert fully incorporated Millet's disabilities that the ALJ found credible and is supported by substantial evidence.

**RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v.

United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28

U.S.C. § 636(b)(1)).[24]

New Orleans, Louisiana, this ____20th____ day of October, 2015.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[24]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.